LATHAM & WATKINS LLP
   Daniel M. Wall (Bar No. 102580)
   Belinda S Lee (Bar No. 199635)
   Brendan A. McShane (Bar No. 227501)
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095
Email: *Dan.Wall@lw.com*
        *Belinda.Lee@lw.com*
        *Brendan.McShane@lw.com*

*Counsel for Defendants Toshiba Corporation,*
*Toshiba America Information Systems, Inc.,*
*Toshiba Samsung Storage Technology Corporation,*
*and Toshiba Samsung Storage Technology Korea*
*Corporation*

[Additional Moving Defendants and Counsel Listed
on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | Base Case No. 3:10-md-2143 RS MDL No. 2143 |
| This Document Relates to: *Hewlett-Packard Co. v. Toshiba Corporation, et al.*, No. 3:13-cv-05370-RS | Case No. 3:13-cv-05370 RS **DEFENDANTS' OPPOSITION TO HP INC.'S MOTION TO PARTIALLY EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DESIGNATED EXPERTS EDWARD SNYDER AND KEVIN MURPHY** |

Date:      September 26, 2017
Time:      9:00 a.m.
Location:  Courtroom 3, 17th Floor

*[Proposed] Order Filed Concurrently Herewith*

**REDACTED VERSION PURSUANT TO COURT ORDERS (DKT. 2721 AND 2773)**

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 3

      A.   Motions to Strike Should Be Denied When Expert Testimony is
           the Product of Reliable Principles and Methods and It Will Assist
           the Jury ................................................................................................... 3

      B.   HP Does Not Dispute the Qualifications of Dr. Snyder and Dr.
           Murphy to Opine Regarding Product Life Cycles and Pricing
           Margins ................................................................................................... 4

      C.   Dr. Snyder's and Dr. Murphy's Opinions Regarding the
           Importance of ODD Life Cycles in any Overcharge Analysis Are
           Squarely Relevant and Reliable .............................................................. 5

           1.   The Economic Concept of Product Life Cycles Goes
                Directly to the Reliability of Dr. Aron's Proffered
                Overcharge Model ....................................................................... 5

           2.   Dr. Snyder's Opinions Regarding Industry Dynamics,
                Including ODD Life Cycles, Are Supported by Economic
                Literature and the Record ............................................................ 6

           3.   Dr. Snyder Empirically Demonstrated the ODD Life Cycle
                Concept ........................................................................................ 8

           4.   HP Misconstrues Dr. Murphy's Analysis of the Behavioral
                Evidence, and His Reference to ODD Product Lifecycles ...... 11

      D.   Dr. Snyder's and Dr. Murphy's Gross Margins Analyses Are
           Relevant and the Product of Reliable Principles and Methodologies ... 14

           1.   Dr. Snyder's Gross Margins Analysis is Relevant to the
                Existence of Any Conspiratorial Overcharge ........................... 15

           2.   Dr. Murphy Analyzed Gross Margins In Order to
                Empirically Test Whether the Behavioral Evidence Is
                Consistent With Collusion ......................................................... 16

           3.   HP's Criticisms Are Unfounded and Misplaced ....................... 18

                a.   Analysis of Patterns in Gross Margins is Not Only
                     Generally Accepted in Economics, it is an Industry
                     Standard ......................................................................... 18

                b.   Visual Analysis is Sufficient for Dr. Snyder's and
                     Dr. Murphy's Gross Margins Analysis .......................... 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                                    DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
                                              i   OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
                                                    Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

4.    HP's Suggestion That A Regression Analysis Is the Only Accepted Method of Reliably Assessing the Price-Cost Relationships Is Wrong ............................................................................ 20

5.    HP Mischaracterizes the Point of Dr. Snyder's Gross Margin Analyses ................................................................................ 22

III.    CONCLUSION ............................................................................................................ 23

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. Ameritech Servs., Inc.*,
231 F.3d 414 (7th Cir. 2000) ......................................................................................21

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
738 F.3d 960 (9th Cir. 2013) ......................................................................................23

*In re Apple iPod iTunes Antitrust Litig.*,
05-CV-0037 YGR, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014)...........................21

*Estate of Barabin v. AstenJohnson, Inc.*,
740 F.3d 457 (9th Cir. 2014) .........................................................................................3

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007) .........................................................................................3

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993).........................................................................................3, 8, 20, 21

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .......................................................................................4

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999).................................................................................................3, 21

*In re Methionine Antitrust Litig.*,
No. 00-1311, 2033 WL 22048232 (N.D. Cal. Mar. 28, 2010) ...............................21

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) .....................................................................................3, 4

*Scantin v. General Elec. Co.*,
510 Fed. Appx. 543 (9th Cir. Feb. 21, 2013)............................................................22

*United States v. Valencia*,
600 F.3d 389 (5th Cir. 2010) ................................................................................20, 21

### RULES

Fed. R. Evid. 702 .............................................................................................3, 4, 15, 23

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

# OTHER AUTHORITIES

Alessandro Tarozzi, *Can Census Data Alone Signal Heterogeneity in the Estimation of Poverty Maps?*, 95 J. Dev. Econ. 170 (2011)......................................................9

David Scheffman & Mary Coleman, *FTC Perspectives on Econometric Analyses in Antitrust Cases*, *in* ABA Section of Antitrust Law, Econometrics (2005) .........................21

David Wooff, *Review: "Logistic Regression: A Self-Learning Text by D. G. Kleinbaum and M. Klein,"* 167 J. Royal Stat. Soc'y, Series A (Stats. in Society) 192 (2004)..................................................................................................19

James F. Nieberding, *Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues*, 9 J. Applied Econ. 361 (2006).....................6

James Stock & Mark Watson, *Introduction to Econometrics* (2003) ...........................................11

John H. Johnson and Gregory K. Leonard, *In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings*, 22 Antitrust 108 (2008)..................................................................................................20

Mohan P. Rao, et al., *Econometric Analysis*, *in* Litigation Services Handbook: The Role of the Financial Expert (Roman L. Weil et al, eds., 2012).............................................20

Paul Belleflamme & Martin Peitz, *Industrial Organization: Markets and Strategies* (2010) .................................................................................................15, 17, 18

Peter Kennedy, *A Guide to Econometrics* (6th ed. 2008) ...............................................................13

Richard Posner, *Antitrust Law* (2d. ed. 2001).......................................................................... *passim*

Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics* (7th ed. 2009) ...............................7

Yu-Hui Wang et al., *Life Cycle Analysis of the Optical Disc Industry Market Innovation and Development*, 17 Innovation: Management, Policy & Practice, 196 (2015)..................................................................................................................7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

## I.    **INTRODUCTION**

HP's Motion should be denied because Dr. Edward Snyder and Dr. Kevin Murphy have each proffered opinions that are relevant, reliable, and likely to assist the jury.

HP seeks to exclude two opinions of Dr. Snyder and Dr. Murphy that squarely relate to the overcharge and damages opinions offered by HP's own expert:  (1) Dr. Snyder's and Dr. Murphy's discussions of how and why ODD product life cycles should be accounted for in a proper antitrust overcharge analysis; and (2) their empirical analyses of the gross margins of ODD suppliers that look for patterns in the data that support the existence or non-existence of a conspiracy.  Dr. Snyder and Dr. Murphy have each spent decades teaching and writing about the issues central to their work in this case, and each of their opinions on these issues is relevant and the product of reliable methods and principles.  HP's Motion should be denied.

**First,** HP begins by attacking Dr. Snyder's and Dr. Murphy's discussions of product life cycles without providing any context or explanation regarding those discussions.  As Dr. Snyder explained, he undertook an analysis of many factors in the ODD industry—including product life cycles—to test the reliability of the overcharge and damages model offered by HP's own expert, Dr. Debra Aron.  Dr. Aron's model *assumes* a constant relationship between price and costs during the alleged six-year conspiracy period and the six-year post-conspiracy (or "benchmark") period.  Citing peer-reviewed literature, Dr. Snyder explains how the relationship between prices and costs varies depending on the stage of a product's life cycle (*i.e.*, development, growth, maturity or decline), and then empirically demonstrates the pricing patterns for different ODD formats at various points during the alleged conspiracy and benchmark periods.  Similarly, Dr. Murphy plotted price and cost trends during and after the alleged conspiracy period to assess whether the behavioral evidence is consistent with the broad conspiracy asserted by HP.

Dr. Snyder and Dr. Murphy each find that the trajectories of quantity and price, and between price and cost, reveal patterns that are consistent with changes in ODD life cycles—and inconsistent with Dr. Aron's untested assumption of a constant price-cost relationship between her benchmark and alleged conspiracy periods.  HP's Motion ignores this empirical work and argues that any discussion of life cycles must be stricken because Dr. Snyder and Dr. Murphy never built

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

1

"life cycle models."  HP cites no authority for that argument, and never explains what a "life cycle model" would entail or why a formal statistical model is necessary to establish that an industry experienced product life cycles that impact the relationships between prices and costs.

**Second,** Dr. Snyder's and Dr. Murphy's gross margins analyses are also relevant and reliable evidence.  Both experts analyzed Defendants' gross margins as part of their investigations into whether ODD prices were elevated as a result of the alleged conspiracy (Dr. Snyder) and whether patterns in ODD prices are consistent with the conspiracy HP pleads (Dr. Murphy).  The evaluation of price-cost ratios (or gross margins) of industry participants is a generally accepted method of investigating whether industry prices were affected by collusion.  As Judge Richard Posner has explained, gross margin analyses inform the question of "whether changes in costs or in demand explain [price changes] or whether the most plausible explanation is cartelization."[1]

That is what Dr. Snyder and Dr. Murphy did.  Dr. Snyder calculated gross margins and plotted price and cost values to evaluate whether there were specific tell-tale signs of collusion:  a jump in margins at the beginning of the alleged conspiracy period; a fall in margins at the end of the alleged conspiracy period; and periods during which prices do not track costs.  Similarly, Dr. Murphy used a gross margin analysis to determine whether the ODD industry experienced unexplained changes in prices that were not due to changes in costs, and could potentially be caused by conspiracy.  He compared Defendants' gross margins from the post-conspiracy benchmark period to margins during the alleged conspiracy period, and controlled for lingering effects of the alleged conspiracy by analyzing margins at the three-, six- and twelve-month periods on either side of October 2009—the end of the alleged conspiracy period.

HP's Motion ignores this empirical work and makes only the unsupported claim that Dr. Snyder's and Dr. Murphy's analyses are unreliable because they did not "run a regression analysis."  HP cites no economic or legal authority for that argument; that is not surprising, given that courts, economists and federal antitrust enforcers agree that a regression is not required to

---

[1]    *See* Declaration of Belinda S Lee in Support of Defendants' Opposition to HP Inc.'s Motion to Partially Exclude Certain Opinions and Testimony of Designated Experts Edward Snyder and Kevin Murphy ("Lee Declaration"), Ex. 10 (Richard Posner, *Antitrust Law* 88 (2d. ed. 2001)).

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

2

analyze data patterns.  Aside from that, HP does nothing to show why their gross margins analyses would not have identified patterns consistent with collusion, had those patterns existed in the data.

The opinions offered by Dr. Snyder and Dr. Murphy are relevant and supported by fundamental economic principles and reliable methodologies.  Although their opinions undermine those offered by HP's own economist, that does not provide a basis to exclude their testimony.

## II.    ARGUMENT

### A.    Motions to Strike Should Be Denied When Expert Testimony is the Product of Reliable Principles and Methods and It Will Assist the Jury

Federal Rule of Evidence 702 permits a qualified expert to present testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue" when that testimony is both relevant and the product of reliable principles and methods.  Relevancy simply requires that "[t]he evidence . . . logically advance a material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)).  The issue of reliability relates to "whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id*. (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

The Supreme Court outlined several factors that district courts may use to determine the reliability of expert testimony, including "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993).  Whether these specific factors are "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 526 U.S. at 150, 153 (pointing out that the reliability inquiry is "a flexible one").

The Ninth Circuit makes clear that the "test of reliability is 'flexible' . . . .  When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010).  "Shaky but admissible evidence is to be attacked by cross examination,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

3

contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564; *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").  Accordingly, an opposing party's disagreement with opinions offered by an expert is not a sufficient basis to strike that testimony.

### B.    HP Does Not Dispute the Qualifications of Dr. Snyder and Dr. Murphy to Opine Regarding Product Life Cycles and Pricing Margins

There is no dispute that Dr. Snyder and Dr. Murphy meet the first requirement under Rule 702—they are each "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Dr. Edward A. Snyder is the Indra K. Nooyi and William S. Beinecke Professor of Economics and Management at the Yale School of Management, a position that he has held since July 2011.  Prior to that time, Dr. Snyder was Dean and George Shultz Professor of Economics at the University of Chicago, Booth School of Business.  (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 1).)  Dr. Snyder's expertise is Industrial Organization—the field of economics that deals most directly with pricing and distribution of products, interactions among competitors, contracting practices, and antitrust issues.  (*Id*. ¶¶ 3-4.)  Through his nearly 40 year career in economics, Dr. Snyder has earned a reputation as an expert on pricing practices, product distribution, vertical integration and contracting, and industrial organization generally.  (*Id*.)

Dr. Kevin Murphy is the George J. Stigler Professor of Economics at the Booth School of Business and the Department of Economics at the University of Chicago, where he has taught since 1983.  (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 1).)  Dr. Murphy teaches graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy issues.  (*Id*. ¶ 2.)  In teaching these courses, Dr. Murphy covers a wide range of topics, "including the incentives that motivate firms and individuals, the operations of markets, and the impacts of regulation and the legal system." (*Id*. ¶ 3.)  As Dr. Murphy explains, "[m]ost of my teaching focuses on two things:  how to use the tools of economics to understand the behaviors of individuals, firms and markets; and how to apply economic analysis to data.  My focus in both research and teaching is on integrating economic principles with empirical analysis." (*Id*.)

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

4

Dr. Snyder and Dr. Murphy have each authored scores of articles in a variety of areas in economics, including pricing, market mechanisms, and the distribution of products. (*See* Lee Decl., Ex. 1 (Snyder Rpt., Appx. A at A5-A14), Ex. 2 (Murphy Rpt., Appx. A at 2-10).) Although HP's motion purports to challenge certain of the opinions offered by these two renowned economists, HP does not—and cannot—challenge their qualifications or background expertise to opine regarding any of the issues included in their reports.

**C.      Dr. Snyder's and Dr. Murphy's Opinions Regarding the Importance of ODD Life Cycles in any Overcharge Analysis Are Squarely Relevant and Reliable**

Dr. Snyder's and Dr. Murphy's opinions regarding the importance of industry factors—including ODD life cycles—in the economic analysis of antitrust claims are relevant and reliable evidence. That analysis is squarely relevant to the reliability of the overcharge and damages model offered by Dr. Aron, which *assumes* a constant relationship between price and costs during the alleged six-year conspiracy period and the six-year benchmark period. Dr. Snyder's and Dr. Murphy's work shows that Dr. Aron's assumption is not supported by the record.

**1.      The Economic Concept of Product Life Cycles Is Directly Relevant to the Reliability of Dr. Aron's Proffered Overcharge Model**

Dr. Aron developed a reduced-form regression to predict but-for prices during an assumed conspiracy period. (Lee Decl., Ex. 3 (Aron Rpt. ¶¶ 96-97).) Her model seeks to determine the relationship between the "dependent" variable (quarterly ODD prices) and one or more "explanatory" variables (supply and demand factors) during a benchmark—or "clean"—period, and then uses that relationship to predict backwards (or "backcast") but-for prices during the assumed conspiracy period. (*Id*. ¶ 65.) In other words, Dr. Aron uses a six-year benchmark period (Q3 2009 through Q3 2015) to predict *but-for* prices during an assumed six-year conspiracy period (Q2 2003 through Q2 2009). (*Id*. ¶¶ 64, 96-97.)

Dr. Aron's "backcasting" approach relies on a very important assumption:  that the relationship between quarter-to-quarter changes in (a) ODD prices and (b) the explanatory variables (here, ODD component costs and PC shipments) is the same across the alleged

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

5

conspiracy and benchmark periods (*i.e.*, Q2 2003 through Q3 2015).[2] (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 234).) As Dr. Snyder explains, "[i]f that assumption is wrong, that is, if the relationship between price and the determinants of price differs between the benchmark and the alleged conspiracy periods, then Dr. Aron's approach would not reliably predict but-for prices and, consequently, overcharge." (*Id.*) Dr. Aron never tested that assumption:

> Dr. Aron did not probe the validity of her underlying assumption nor did she consider the fundamental change in the ODD industry in the so-called benchmark period when revenues were falling, ODD products were becoming obsolete, and substitute means of storing and communicating information were reducing the value of ODDs to consumers. Dr. Aron did not even address whether, due to the changes that occurred in the ODD industry over more than a decade, supply and demand factors affected prices differently in the alleged conspiracy and in the benchmark periods.

(*Id.* ¶ 235.) Consistent with what economic literature agrees is required for a reliable overcharge analysis,[3] both Dr. Snyder and Dr. Murphy evaluated whether the relationship between prices and costs was stable across the alleged conspiracy and benchmark periods. Far from speculative, these empirical analyses actually test what Dr. Aron simply assumed.

### 2. Dr. Snyder's Opinions Regarding Industry Dynamics, Including ODD Life Cycles, Are Supported by Economic Literature and the Record

As part of a broader analysis of the ODD industry, Dr. Snyder analyzed the concept of product life cycles.[4] In particular, based on the record evidence, Dr. Snyder points out that "the major ODD formats – CDs, Combo, DVD, and Blu-ray – were in different stages of their product

---

[2] Dr. Aron estimated her model using these inputs "in first differences," which means that she estimated the relationship between (i) the quarter-to-quarter change in price, and (ii) the quarter-to-quarter change in ODD costs and PC shipments, during the six-year benchmark period. (Lee Decl., Ex. 3 (Aron Rpt. ¶¶ 101-02).)

[3] *See, e.g.,* Lee Decl., Ex. 9 (James F. Nieberding, *Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues*, 9 J. Applied Econ. 361, 369 (2006) ("In using the forecasting approach, one assumes that the same relationship among price and the independent variables that exists in the benchmark period also holds in the cartel period. However, if this relationship does appreciably change during these two periods, the forecast model may not reliably predict but-for prices vis-à-vis an approach that accounts for this.")).

[4] As Dr. Snyder explains, "industry analysis is essential for sound economic analysis of antitrust claims. Especially important are features of the industry that affect pricing, e.g., buying power, product innovations, product cycles, and how products are distributed." (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 38).)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

6

life cycles" during the alleged conspiracy period (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 59).)  As he explains, "[p]roduct life cycles are often divided into four primary stages:  (1) *development*, during which a product is introduced; (2) *growth*, characterized by increasing demand for the product; (3) *maturity*, when demand levels off; and (4) *decline*, as the demand decreases."  (*Id*.)  And contrary to HP's assertion, Dr. Snyder cites several articles in his report to explain the established economic concept of "product life cycles," including one where life cycles were "applied to consumer technology products like ODDs."[5]

Dr. Snyder explains the relevance of considering product life cycles as part of any overcharge analysis in this action.  "Because different ODD categories were in different stages of their product life cycles, one would not expect price-to-cost margins to be the same across ODDs at any point in time.  This is because economic factors at each stage of the product life cycle have implications on how products are priced."  (*Id*. ¶ 63.)  In other words, during different stages of a product's life cycle, ODD suppliers have different costs, consumer demand, efficiencies, and production numbers, among other things, all of which impact the relationship between pricing and costs.  (*Id*. ¶¶ 64-68.)  As Dr. Snyder explains, "[a]s costs decrease due to improvements in production processes and scale economies, markups (i.e., the degree to which sellers charge prices that are higher than their costs) are likely to fall as well."[6]

HP's claim that the theory of product life cycles is somehow novel or "unfounded in economics" is entirely unsupported.  (Mot. at 1-3.)  HP ignores several references to peer-reviewed literature cited in Dr. Snyder's report that discuss the importance of product life cycles to the evaluation of price, marketing and profitability of products over time.  (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 59 n.36).)  HP also ignores the evidentiary record in this case, including deposition

[5]    *See id*. ¶ 59 n.36 (citing, among others, Yu-Hui Wang et al., *Life Cycle Analysis of the Optical Disc Industry Market Innovation and Development*, 17 Innovation: Management, Policy & Practice, 196, 196-216 (2015)).

[6]    Lee Decl., Ex. 1 (Snyder Rpt. ¶ 69 n.56 (citing Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics* 403 n.9 (7th ed. 2009) ("The prices of new electronic products also come down over time because costs fall as producers start to achieve greater scale economies and move down the learning curve.  But even if costs did not fall, producers can make more money by first setting high prices and then reducing them over time, thereby discriminating and capturing consumer surplus."))).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

7

testimony cited in Dr. Snyder's report in which ODD participants recognize the importance of product life cycles in the ODD industry. (*Id.* ¶ 63 n.41 (citing Billy Reynolds' deposition testimony)).[7] HP even ignores the work undertaken by economists retained by other Plaintiffs in this action, including Dr. Gary French,[8] who acknowledged the importance of controlling for product life cycles in any overcharge analysis: "[t]he two reasons that prices for ODDs have fallen over time are the decline in manufacturing cost and product obsolescence . . . . The PLDS/Lite-On material costs measure captures the effect of falling manufacturing costs on ODD prices. I control for obsolescence by including a linear trend variable and a squared trend variable for each drive type and height." (Lee Decl., Ex. 4 (French Rpt. ¶ 166).) Similarly, Dr. Gareth Macartney (Acer) recognizes that "each [ODD] format when launched comes in at a high price, before decreasing to prices similar to the older formats." (Lee Decl., Ex. 5 (Macartney Rpt. at 47).) Dell's expert Dr. Mohan Rao also testified at deposition that firms will engage in different pricing strategies depending on the product's current life cycle phase. (Lee Decl., Ex. 6 (Rao Dep. (Mar. 20, 2017) at 190); *see also* Lee Decl., Ex. 7 (Flamm (IPPs) Dep. (May 24, 2017) at 180:7-183:13 (acknowledging that different ODD drive types underwent different phases of a life cycle during the 2003 to 2010 time period)).)

This economic and record support establishes that Dr. Snyder's consideration of ODD life cycles "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. As Dr. Snyder explains, "[s]ince life cycle (or, more precisely, the stage in the life cycle that a product is at) plays a role in determining the price of a product, failure to control for this factor can bias the results of a regression model." (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 293).)

### 3. Dr. Snyder Empirically Demonstrated the ODD Life Cycle Concept

Dr. Snyder did more than just discuss the concept of ODD life cycles. He also empirically demonstrated the price patterns for different ODD formats at various points during the alleged

[7] *See also* Lee Decl., Ex. 1 (Snyder Rpt.) at Footnotes 37-40 (citing TSR reports describing life cycle-related trends for different ODD product types).

[8] Dr. French was retained by the same attorneys who represent HP and provided expert testimony in this case on behalf of now-dismissed Plaintiffs Ingram Micro and SYNNEX.

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

8

conspiracy and benchmark periods, in order to test Dr. Aron's underlying assumption.  To do so, he used data compiled from Techno Systems Research ("TSR") reports to plot quantity and average price over time, by product type.  (*Id*. ¶ 52.)  The trajectories of quantity and price reveal the life cycle of each product: the low sales quantities and high prices of the development phase transition to the high quantities and low prices of maturity, and quantities finally taper off in the product's decline phase.[9]  (*See id*. ¶ 240, Exhibit VIII-B-1 ("For each ODD type, the average price is high as the product enters the market and then falls rapidly to align with the price of ODD types that are relatively 'older' in their life cycles, both as the cost of production falls and demand for that product falls as well.").)

HP's request to exclude Dr. Snyder's empirical analysis of these life cycles is meritless. Its entire argument rests on the claim that Dr. Snyder's opinions are unreliable because he did not build a formal "life cycle model."  (Mot. at 3 ("Without an ODD life cycle model, Dr. Snyder's theory results in little more than possibilities:  ideas and concepts that Dr. Snyder never applies to Defendants.").)  HP does not cite to any legal or economic authority that states that a "life cycle model" is required to assess whether the relationship between prices and costs varies over time. HP also does not explain what this supposedly necessary "life cycle model" would entail, or why a formal statistical model is necessary to establish that an industry experienced product life cycles, which would likely impact the relationship between prices and costs.  In fact, economists regularly use visual analysis to assess prominent trends in data.[10]  HP's criticism also misconstrues the purpose of Dr. Snyder's analyses.  Dr. Snyder was not trying to pinpoint exact

[9]    Dr. Snyder reports his empirical results in exhibits appended to his Report.  (*See* Lee Decl., Ex. 1 (Snyder Rpt. ¶¶ 59-67 and Exhibits IV-D-1 (Blu-ray), IV-D-2 (DVD-RW), IV-D-3 (DVD-ROM), IV-D-4 and IV-D-5 (CDs)).)  For example, DVD-R/RW (Exhibit IV-D-2) was in development in the late 1990s and early 2000s, with prices exceeding $300 and quantities minimal.  Over the next decade, DVD-R/RW transitioned through the growth and maturity phases, with prices falling by more than a factor of ten, to under $20, while quantity rose by a factor of nearly 1000, to a peak of 280 million.  By 2015, the product was in its decline, with quantity down below 150 million.

[10]    *See, e.g.,* Lee Decl., Ex. 14 (Alessandro Tarozzi, *Can Census Data Alone Signal Heterogeneity in the Estimation of Poverty Maps?*, 95 J. Dev. Econ. 170, 179 (2011) ("Visual inspection of the histograms in Fig. 4 is sufficient to see that the accuracy of the poverty mapping declines for both poverty and literacy headcounts, when compared to the results obtained with the inclusion of all predictors shown in Fig. 3.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

9

dates during which each ODD type transitioned from one phase of its product life cycle to another. Rather, Dr. Snyder used the product life cycle data to show why Dr. Aron's assumption—that the relationship between price and her control variables, including costs, remained constant over the course of a six-year alleged conspiracy period and a six-year benchmark period—is likely to be wrong. (Lee Decl., Ex. 1 (Snyder Rpt. ¶¶ 234, 243-44).) The implausibility of Dr. Aron's assumption is illustrated visually in Dr. Snyder's analyses – including Exhibit V-B-1B:

Exhibit V-B-1B

As Dr. Snyder explains, ". . . prices are generally higher relative to costs in the earlier years of the period of analysis.

(*Id.* ¶ 161.) Dr. Snyder did not need a formal "life cycle model" to make this straightforward point.

Finally, HP's Motion ignores that Dr. Snyder conducted a formal test to evaluate the assumption underlying Dr. Aron's overcharge model. Dr. Snyder used a well-established statistical method called a Chow Test to examine whether the relationships between prices and Dr. Aron's control variables were the same in the first and second half of her benchmark period. (*Id.* ¶¶ 243-47.) This test rejects with high statistical confidence that the relationships were

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
10 OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

constant. (*Id.*).[11] Accordingly, Dr. Snyder's opinions regarding the need to control for ODD life cycles in any overcharge analysis are both scientifically and empirically supported, and are directly relevant to the reliability of Dr. Aron's proffered overcharge model.

### 4.    HP Misconstrues Dr. Murphy's Analysis of the Behavioral Evidence, and His Reference to ODD Product Lifecycles

HP's request to exclude Dr. Murphy's opinions regarding ODD product life cycles is equally misplaced. Dr. Murphy references ODD life cycles in connection with his evaluation of the behavioral evidence (*i.e.*, analyzing price trends during the alleged conspiracy and benchmark periods), and in connection with assessing the reliability of Dr. Aron's overcharge model. (Lee Decl., Ex. 2 (Murphy Rpt. ¶¶ 94-103, 168-176).) Similar to its challenges to Dr. Snyder's testimony, HP claims that Dr. Murphy's opinions regarding ODD life cycles are unreliable because "Dr. Murphy does not conduct any statistical or econometric analysis actually applying his theory to Defendants' conspiracy." (Mot. at 4.) Once again, HP's critiques miss the mark.

First, HP claims that Dr. Murphy merely "creates time series price trends of various product types, and eyeballs the results to conclude that the trends are 'entirely consistent with changes in prices being determined by life cycle effects in dynamic industries.'" (Mot. at 4 (citing Murphy Rpt. ¶ 97).) But Dr. Murphy's report makes clear that he undertakes several different analyses to reach his opinion that the behavioral and structural evidence is not consistent with the broad conspiracy pled by HP. Dr. Murphy analyzes: (1) whether there is any evidence of unexplained changes in prices when the cartel allegedly ended, and whether changes in prices that occurred during and after the relevant period can be explained by changes in supply and demand factors; (2) the impact of fluctuating market shares among Defendants during and after the alleged conspiracy period; (3) empirical evidence regarding bidding at Dell and HP procurement events; and (4) whether changes in Defendants' capacity utilization are consistent

---

[11]    *See, e.g.*, Lee Decl., Ex. 16 (James Stock & Mark Watson, *Introduction to Econometrics* 467 (2003) ("A second type of nonstationarity arises when the population regression function changes over the course of the sample. In economics, this can occur for a variety of reasons, such as changes in economic policy, changes in the structure of the economy, or an invention that changes a specific industry. If such changes, or 'breaks,' occur, then a regression model that neglects those changes can provide a misleading basis for inference and forecasting.")).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
11    OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

with an agreement to stabilize prices through reducing supply, and whether there were any shifts to Defendants' utilization levels after the alleged cartel concluded. (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 92).)

HP's Motion targets only the first set of analyses, which relates to Dr. Murphy's empirical testing of pricing changes during the alleged conspiracy and benchmark periods that are reported in Exhibits 5A-5D to his report. (*Id.* ¶ 94.) As part of that analysis, Dr. Murphy looked at yearly average prices by ODD type, and included a yearly measure of per-unit costs for the drives, and the number of recordable optical disc media shipments as a proxy for ODD demand. (*Id.* ¶ 95.) Dr. Murphy then "computed prices and costs using a weighted average of all drives within each category (Combo, DVD-ROM and DVD-RW) from the Defendants' transaction data for the time period 2003-2011." (*Id.*) Based on his visual inspection of the trends, Dr. Murphy finds that margins are falling during the conspiracy period because the relationship between prices and costs is changing. As Dr. Murphy explains, these results "are entirely consistent with changes in prices being determined by life cycle effects in dynamic industries." (*Id.* ¶ 97.)

> In the early part of the DVD-RW life cycle, costs were falling rapidly as learning-by-doing reduced firms' costs. The rapid decrease in costs also caused prices to fall sharply in the early part of the life cycle. Over the life cycle of a product, costs began to fall more slowly and demand became more elastic as the products sold by different firms became more standardized and new products are introduced that attract customers looking for the latest product. This is why we tend to see higher prices for products that are earlier in their life cycle. (See Exhibit 6.) Over time, older versions of the products, such as CDs and Combos become obsolete, and new products are introduced such as Blu-ray ODDs.

(*Id.*) These are all trends in the data that Dr. Murphy assessed and graphically illustrated in the Exhibits to his report. While Dr. Murphy opines that these reductions in margins are consistent with life cycle effects, his opinion that margins are falling during the period does not depend on whether it is life cycle effects or something else that is causing those changes. The critical point of this analysis is that these price-cost changes are taking place during the alleged conspiracy period, and so it must be that some factor other than a conspiracy caused the changes in margins over time. (*Id.* ¶ 98.) There was no need for Dr. Murphy to estimate a formal model of life cycle

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

12

effects because his opinion does not depend on calculating the precise shifts in life cycles among different types of ODDs during the alleged conspiracy period.

Second, for the same reasons discussed above, HP's request to exclude Dr. Murphy's opinion about the need to control for ODD life cycles in any overcharge analysis lacks merit.  HP refers to out-of-context deposition testimony where Dr. Murphy stated that economists have "built models to try to explain lifecycles," and then argues that Dr. Murphy's failure to implement a formal regression or statistical model here renders his opinions unreliable.  (Mot. at 4.)  That argument is unsupported and also misconstrues the purpose of the analysis.  Although Dr. Murphy testified that a "model" could be used to identify the precise timing of shifts from one life cycle phase to the next, that inquiry was unnecessary here.  Dr. Murphy plotted price and cost trends to determine whether Dr. Aron's assumption of a constant relationship between prices and costs during the alleged conspiracy and benchmark periods is consistent with the data—and the results show that it was not.[12]  As Dr. Murphy explains, "if the relationship between prices and costs was different in the relevant period compared to the benchmark period for reasons that are unrelated to an alleged conspiracy, then Dr. Aron's methodology would improperly attribute any difference between but-for and actual prices of ODDs to the alleged collusion, instead of attributing these differences to the changed market conditions." (*Id.* ¶ 171.)  The exact timing of when each ODD type shifted from one phase to another is not material.  Rather, Dr. Murphy's results show that "a crucial factor [Dr. Aron] omitted from her model is that the ODDs are at different stages of their life cycle during the two periods." (*Id.* ¶ 170 (citing Peter Kennedy, *A Guide to Econometrics* 93-94, 100 (6th ed. 2008)).)

Finally, similar to its critique of Dr. Snyder, HP ignores Dr. Murphy's separate Chow Test that he used to "test the validity of Dr. Aron's assumption that the relationship between prices and her control variables was stable across the two periods." (*Id.* ¶ 176.)  Dr. Murphy implemented a statistical method to test whether the relationship between prices and costs was stable within each

[12]      As Dr. Murphy explains, "[t]he reliability of Dr. Aron's regression model also critically depends on the validity of her assumption that the supply and demand factors used in her regression model would have had the same effect on ODD prices in the relevant period as in the benchmark period but-for the alleged conspiracy." (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 171).)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS
13

of the alleged conspiracy and benchmark periods, because "[t]he absence or presence of the alleged cartel is the same within each of those two periods and therefore would not lead to changes in the relationship between price and cost within each period." (*Id*.) As Dr. Murphy reports, "[t]he results of my test show statistically significant differences in the relationship between Dr. Aron's cost variable and prices within both periods." (*Id*.) These results – which HP fails to mention – "is exactly what we would expect to see here because ODDs are at different stages of their life cycles in the early part of the relevant period and the benchmark period." (*Id*.)

Ultimately, like Dr. Snyder, Dr. Murphy's opinions are supported by the established economic concept of product life cycles and were tested empirically through data analysis. HP's bare assertion that these experts should have run formal statistical models in order to test for a different inquiry is insufficient to render their opinions unreliable.

### D.    Dr. Snyder's and Dr. Murphy's Gross Margins Analyses Are Relevant and the Product of Reliable Principles and Methodologies

HP's attacks on the gross margins analyses undertaken by Dr. Snyder and Dr. Murphy also lack merit. Both experts analyzed Defendants' gross margins as one piece of their investigation into whether prices in the ODD industry were elevated as a result of the alleged conspiracy (Dr. Snyder) and whether patterns in ODD prices are consistent with the conspiracy HP pleads (Dr. Murphy). Economists recognize that analyzing gross margins—a basic measure of the relationship between prices and costs—informs the question of whether the empirical data supports the existence of a price-fixing conspiracy. That is because it is well accepted that "the formation of a successful cartel should allow its members to charge higher prices," and therefore increase gross margins, and the "dissolution of a successful cartel should cause a reduction in prices by its members," reflected as a decrease in gross margins. (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 101).)

The evaluation of price-cost ratios (or gross margins) of industry participants is a generally accepted method of investigating whether industry prices were affected by collusion. Antitrust and economics scholars agree that "price increases . . . unexplained by any increases in cost may . . . be good evidence of the initiation of a price-fixing scheme." (Lee Decl., Ex. 10 (Richard Posner,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

14

*Antitrust Law* 88 (2d. ed. 2001)).)[13]  Here, the results of Dr. Snyder's and Dr. Murphy's gross margin analyses show that ODD prices closely tracked Defendants' material costs and that there were no tell-tale changes in margins at the beginning or the end of the alleged conspiracy.  In other words, changes in price are consistent with corresponding changes in costs and the classic life cycle pattern in pricing described above, in which margins are higher earlier in the product life cycle.  (*See* Lee Decl., Ex. 1 (Snyder Rpt. ¶¶ 160-63, Exhibits V-B-1A–E); Ex. 2 (Murphy Rpt. ¶¶ 94-103, Exhibits 5A–D).)  Both experts' analyses are therefore "the product of reliable principles and methods," the results of which will "help the trier of fact" by showing that changes in costs and life cycle evolutions, and not a conspiracy, were the cause of ODD price increases (or decreases) during the alleged conspiracy period.  Fed. R. Evid. 702; *see also* Lee Decl., Ex. 10 (Posner, *supra*, at 88 (explaining that gross margin analyses inform the question of "whether changes in costs or in demand explain [price changes] or whether the most plausible explanation is cartelization.").  HP's attack on Dr. Snyder's and Dr. Murphy's use of this generally accepted method is misleading and misplaced.

### 1.     Dr. Snyder's Gross Margins Analysis is Relevant to the Existence of Any Conspiratorial Overcharge

As part of his investigation into the existence of potential overcharges, Dr. Snyder empirically analyzed Defendants' gross and operating margins because the results would inform three questions: "i. Were the patterns over time in prices and cost measures consistent with HP's allegations?  ii. Were price-cost margin indicators of Defendants' profitability consistent with HP's estimate of overcharges?  [and] iii. Were the data consistent with significant total overcharges?" (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 157).)  For the gross margins analysis, Dr. Snyder plotted Defendants' average monthly ODD prices and material costs by ODD type.  He examined these plotted values for specific tell-tale signs of potential collusion: a jump in margins (a divergence between price and cost) at the beginning of the alleged conspiracy period; a fall in margins

---

[13]     *See also* Lee Decl., Ex. 11 (Paul Belleflamme & Martin Peitz, *Industrial Organization: Markets and Strategies* 365 (2010) ("A second method [for detecting collusion] tests for structural breaks in the behavior of firms, based on the idea that a discrete change in firms' pricing functions might be due to the formation of a cartel (or its demise).").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS
15

(narrowing of price and cost) at the end of the conspiracy period; and periods during which prices do not track costs. Dr. Snyder's results show none of these signs, and instead reflect that prices closely tracked costs for each ODD type analyzed. (*Id*. ¶¶ 158-61, 163, Exhibits V-B-1A–E, V-B-3A–E, V-B-4A–C.)

Dr. Snyder's gross margins analysis was empirical. In addition to plotting prices and costs to investigate the trends explained above, Dr. Snyder calculated gross margins during and after the alleged conspiracy period by ODD type. Dr. Snyder calculated gross margins as (sales price minus materials cost) divided by (sales price). (*Id*. ¶ 162.) He examined these calculations for a drop in margins *after* the alleged conspiracy ended, which would be consistent with the end of successful coordination to raise prices. (*Id*. ¶ 162, Exhibit V-B-2.) In fact, for all four of the ODD types analyzed, margins *increased* after the alleged end of the conspiracy period, a result patently inconsistent with the alleged conclusion of a price-fixing conspiracy. (*Id*.)

**2.    Dr. Murphy Analyzed Gross Margins In Order to Empirically Test Whether the Behavioral Evidence Is Consistent With Collusion**

Dr. Murphy's separate analysis regarding Defendants' gross margins was one piece of his investigation into whether the economic or behavioral evidence is consistent with the broad conspiracy HP pleads. (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 92).) He used a gross margin analysis to determine whether the ODD industry experienced unexplained changes in prices that were not due to changes in costs and could potentially be caused by the alleged conspiracy. (*Id*. ¶ 94.)

Dr. Murphy examined the price to cost relationship and gross margins in two ways. First, Dr. Murphy computed prices and costs from Defendants' transactional data using a weighted average of the values for each drive type (Combo, DVD-ROM, DVD-RW). (*Id*. ¶ 95.) He then plotted those prices and costs, along with ODD shipments (as a proxy for demand), in order to assess potential trends in the data. For each ODD type, the analysis showed that changes in prices closely tracked, or moved with, changes in either cost or demand. (*See id*. ¶ 97, Exhibits 5A-D). This coordinated movement indicates that changes in ODD prices were caused by supply (cost) and demand factors, and not a conspiracy as HP alleges. (*Id*. ¶¶ 95-100, Exhibits 5A-D).

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

16    DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

Second, Dr. Murphy compared Defendants' gross margins from the post-conspiracy, or "benchmark" period, to margins during the alleged conspiracy period.[14]   (*Id.* ¶¶ 101-03, Exhibits 8A-B.)  Dr. Murphy controlled for any lingering effects of the alleged conspiracy by analyzing margins for the three-, six- and twelve-month periods on either side of October 2009 (the end of the conspiracy period alleged by HP).[15]   (*Id.* ¶ 102.)  By analyzing margins in short intervals on either side of the end of the conspiracy period, Dr. Murphy's method controls for supply and demand factors that influence prices over longer terms, because those factors (*i.e.*, a product's life cycle) are unlikely to change over such a short term like three or six months.[16]   (*Id.* ¶ 102; Lee Decl., Ex. 8 (Murphy Dep. (Apr. 30, 2017) at 198:7-23, 391:19-392:21 (explaining that short comparison intervals "give you the cleanest comparisons statistically in the pricing behavior")).)

This before-and-after analysis is highly relevant because "the dissolution of a successful cartel should cause a reduction in prices by its members."  (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 101), Ex. 11 (Belleflamme & Peitz, *supra*, at 365 ("A second method [for detecting collusion] tests for [a] structural break in the behavior of firms, based on the idea that a discrete change in firms' pricing functions might be due to the formation of a cartel (or its demise).").)  Therefore, Dr. Murphy looked for changes in margins marked by the end of the conspiracy, that were not explained by changes in supply (cost) or demand.  That is a generally accepted methodology by economists looking for evidence in the data to reflect the existence or non-existence of an industry cartel.  (*See* Lee Decl., Ex 10 (Posner, *supra*, at 88 ("One simply observes price . . . changes and asks whether changes in costs or demand explain them[.]")).)  The results of Dr. Murphy's gross margins analyses for these three-, six- and twelve-month periods show that margins were steady

---

[14]   HP's economist, Dr. Aron, purports to use the same method in her regression model which estimates price changes during the conspiracy period based on price changes during the post-conspiracy "benchmark" period.

[15]   Dr. Murphy calculated monthly gross margins as equal to (sales price minus materials costs) divided by (sales price).  (*See id.* at Exhibit 8A-B.)

[16]   *But see id.* at Exhibit 7A (showing that the end of the alleged conspiracy period aligned with the end of the Combo drive's life cycle, which was marked by a decrease in demand and therefore a decrease in margins).  For Dr. Murphy's analysis of DVD-RW and DVD-ROM, however, measuring margins in the near term effectively controlled for life cycle changes.  (*See id.* at Exhibits 7B, 8A, 8B).)

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

17

crossing from before to after the "end" of the alleged conspiracy period, which is inconsistent with the conclusion of a successful six-year long conspiracy to increase prices (and margins).

### 3.    HP's Criticisms Are Unfounded and Misplaced

HP's Motion mischaracterizes these gross margin analyses as unreliable because Dr. Snyder and Dr. Murphy did not undertake a formal "statistical or economic analysis," such as a regression. (Mot. at 7-8.) That criticism is either intentionally misleading or demonstrates a lack of understanding for how economists analyze relationships between prices and costs.

#### a.    Analysis of Patterns in Gross Margins is Not Only Generally Accepted in Economics, it is an Industry Standard

HP's central argument is that Dr. Snyder and Dr. Murphy "offer no economic theory supporting their gross margin 'pattern' test" and, therefore, any conclusions drawn from price and cost trends are unreliable. (Mot. at 7:3-9.) That argument is unsupported and wrong. It is common sense that reliable conclusions can be drawn from analyzing trends in Defendants' transactional data. That type of analysis is also supported by economic literature.[17] As Judge Richard Posner characterized it, the "charm" of this precise type of analysis is that it:

> . . . enables the court to avoid having to make a stab at determining what the firms' marginal costs are or what the competitive price and output would be. *One simply observes price and output changes and asks whether changes in costs or in demand explain them or whether the most plausible explanation is cartelization.*[18]

As Judge Posner explained, "price increases . . . unexplained by any increase in cost may . . . be good evidence of the initiation of a price-fixing scheme, while changes in the opposite direction would be evidence that a cartel has just collapsed." *Id*.

Dr. Snyder's and Dr. Murphy's method of analyzing gross margins follows this generally accepted methodology. As Dr. Snyder explains, his gross margin analysis looked for:

> i. *Divergence between prices and costs* at the start of the alleged conspiracy period and a fall in price relative to costs after the end; ii. Periods during which *prices fail to track (or move with) costs* during the alleged conspiracy period; and

---

[17]   *See, e.g.,* Lee Decl., Ex. 11 (Belleflamme & Peitz, *supra*, at 365 (pointing out that "what should raise suspicions about collusion is a sharp increase in the price-cost margin")).

[18]   Lee Decl., Ex. 10 (Posner, *supra*, at 88 (emphasis added)).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS
18

iii. *An increase in margins* at the start of the alleged conspiracy and a *decrease in margins* after the alleged conspiracy ends.

(Lee Decl., Ex. 1 (Snyder Rpt. ¶ 158 (emphasis added)).)  Dr. Murphy's approach also followed this generally accepted methodology.  He examined "whether there are any unexplained changes in prices when the alleged conspiracy allegedly ended."  (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 101); *see also* Ex. 10 (Posner, *supra,* at 88 (explaining that price changes "unexplained" by changes in cost can be evidence of collusion)).)

#### b.  Visual Analysis is Sufficient for Dr. Snyder's and Dr. Murphy's Gross Margins Analysis

HP tries to make much of the fact that both Dr. Snyder and Dr. Murphy conducted their gross margin analysis by "visual inspection" of the plotted price and cost values.  (Mot. at 5-6.) HP argues that a visual inspection alone is unreliable and Dr. Snyder and Dr. Murphy "offer no statistical or econometric analysis establishing their conclusions on 'unexplained' price changes." (*Id*. at 5:15-6:26.)  That argument is unsupported and misconstrues Dr. Snyder's and Dr. Murphy's empirical analyses.

First, HP is incorrect that Dr. Snyder and Dr. Murphy relied solely on a visual inspection of the price-cost trends.  Both experts conducted empirical work on the data to reach their conclusions that the trends of gross margins were inconsistent with the alleged conspiracy. Dr. Snyder calculated average gross margins by ODD type during and after the alleged conspiracy period, as well as for the first half and second half of the alleged conspiracy period.  (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 162, Exhibit V-B-2 (presenting the results of Dr. Snyder's gross margin calculations by ODD type)).)  Dr. Murphy similarly calculated the monthly gross margins at three, six, and twelve months before and after the alleged conspiracy period.  (Lee Decl., Ex. 2 (Murphy Rpt. ¶ 102, Exhibit 8A).)

Regardless of these additional analyses, economists generally recognize that a visual analysis can be useful; statisticians also recognize that it is "probably the most important thing to do with a data set."  (Lee Decl., Ex. 15 (David Wooff, *Review: "Logistic Regression: A Self-Learning Text by D. G. Kleinbaum and M. Klein,"* 167 J. Royal Stat. Soc'y, Series A (Stats. in

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

19  DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

Society) 192, 193 (2004)); Ex. 10 (Posner, *supra*, at 88 ("One simply observes price . . . changes and asks whether changes in costs or demand explain them or whether the most plausible explanation is cartelizaton.")).)[19]  Accordingly, the data analyses undertaken by Dr. Snyder and Dr. Murphy find support within the economics and judicial community, and HP's unsupported claims that these analyses are unreliable should be rejected.  *Daubert*, 509 U.S. at 593-94 (finding "[w]idespread acceptance" of a technique to be an "important factor" in a court's admissibility analysis).

> **4.     HP's Suggestion That A Regression Analysis Is the Only Accepted Method of Reliably Assessing the Price-Cost Relationships Is Wrong**

HP dedicates nearly half of its attack on gross margins to the fact that neither Dr. Snyder nor Dr. Murphy ran a regression to supplement their visual and quantitative analysis of Defendants' prices, costs, and gross margins.  (Mot. at 5-7.)  In particular, HP argues that Dr. Snyder's and Dr. Murphy's failure to "run a regression analysis" is inconsistent with "the generally accepted method for separately assessing the demand and supply factors influencing price."  (*Id*. at 11-13.)  This argument is unsupported and baseless.

Economists, courts, and the government alike agree that "regression analysis is not a mandatory feature in all applications of economics or statistics."  (Lee Decl., Ex. 12 (Mohan P. Rao, et al., *Econometric Analysis*, *in* Litigation Services Handbook: The Role of the Financial Expert 37 (Roman L. Weil et al, eds., 2012) (citing *United States v. Valencia*, 600 F.3d 389, 427

---

[19]     In support of its argument that "visual inspection of trend charts is not a valid method for determining the existence and amount of overcharges in antitrust cases," HP excerpts the language of a single, completely off-topic source.  (*See* Mot. at 2:16-26 (citing John H. Johnson and Gregory K. Leonard, *In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings*, 22 Antitrust 108, 111 (2008)).  This entire article, including the excerpt cited by HP, discusses the sufficiency of economic evidence to support the existence of an industry-wide "pricing structure" for purposes of proving classwide impact at the class certification stage.  That article makes the fundamental point that "there are [] no peer-reviewed papers that put forward the conditions that define whether prices exhibit a 'price structure,' or an appropriate testing procedure for determining whether those conditions are met."  (Nguyen Dec., Ex. 3 at 110.)  It then goes on to show why visual inspection of a hypothetical graph plotting prices for four suppliers across time is alone insufficient to demonstrate an industry-wide pricing structure.  (*Id*.)  That article does not state that visual inspection of data is always insufficient for purposes of evaluating trends or reaching conclusions about the relationships between prices and costs, as HP misleadingly suggests.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

20

(5th Cir. 2010)))).)  Because "[s]tatisticians might have good reasons to look at data in different ways," courts refuse to find "that nothing but regression analyses can produce evidence that passes the *Daubert* and *Kumho Tire* thresholds."  *Adams v. Ameritech Servs., Inc*., 231 F.3d 414, 425 (7th Cir. 2000); *see also Valencia*, 600 F.3d at 427 ("We disagree with defendants' assertion that the testimony should have been excluded because [plaintiff's expert] did not employ multiple regression analysis.").  Even the Federal Trade Commission (FTC) has warned that the advent of regression modeling does not supplant the value and propriety of other quantitative analysis.[20]

None of the cases cited by HP state otherwise.  HP does not cite any authority to support its argument that "*[o]nly* with statistical or econometric analysis, such as multiple regression analysis, can an economist control for other factors influencing price." (Mot. at 7:13-15 (emphasis added).)  Rather, all of the cases HP cites are either inapposite or stand for the unremarkable point that regression analysis is "a *sound* and indeed *commonplace* method for isolating the pricing effects[.]"  (*Id*. at 7:15-18 (citing *In re Apple iPod iTunes Antitrust Litig*., 05-CV-0037 YGR, 2014 WL 4809288, at *4 (N.D. Cal. Sept. 26, 2014) (emphasis added).)[21]

More fundamentally, Dr. Snyder and Dr. Murphy both explicitly addressed what appears to be HP's underlying reasoning for why a regression model is required: "control[ling] for other factors influencing price."  (Mot. at 7.)  Dr. Murphy made clear in his report and at deposition that he chose to analyze gross margins in short-terms surrounding the end of the conspiracy period to address this precise concern, looking at "short[ ] time horizon[s], which is going to give you the cleanest comparisons statistically in the pricing behavior[.]"  (Lee Decl., Ex. 8 (Murphy Dep. (Apr. 30, 2017) at 198:18-23), *see also* Ex. 2 (Murphy Rpt. ¶ 102).)  Similarly, by plotting price and cost on a monthly basis, Dr. Snyder's analysis compares the relationship between prices and costs

---

[20]    *See* Lee Decl., Ex. 13 (David Scheffman & Mary Coleman, *FTC Perspectives on Econometric Analyses in Antitrust Cases*, *in* ABA Section of Antitrust Law, Econometrics 115 (2005) ("[A]lthough there has been much attention in recent years to the use of formal modeling and econometric estimates in antitrust, we should not lose sight of the fact that quantitative analyses of various kinds are useful.").

[21]    *See also* Mot. at 7 (citing *In re Methionine Antitrust Litig*., No. 00-1311, 2033 WL 22048232, at *4-5 (N.D. Cal. Mar. 28, 2010) for the point that "multiple regression methodology *can* recognize[ ] and address[ ] this complexity." (emphasis added)).

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS
21

immediately before and after the end of the alleged conspiracy period. (Lee Decl., Ex. 1 (Snyder Rpt.) at Exhibits V-B-1A to 1E, V-B-3A to 3E, and V-B-4A to 4C.) Moreover, Dr. Snyder's gross margins analysis is just one of several analyses that he conducted in forming his opinions regarding any overcharges. He also analyzed Defendants' operating margins; compared those operating margins to the margins of suppliers of Hard Disk Drives (a comparable product); evaluated the existence of overcharges specific to HP procurement events associated with the HLDS plea or a PLDS admission; reviewed the documentary record; and assessed Dr. Aron's own overcharge model. (Lee Decl., Ex. 1 (Snyder Rpt.) at Sections V, VII.)

Accordingly, HP's primary attack on Dr. Snyder's and Dr. Murphy's gross margins analysis—that their chosen method was not a regression model—preys on the fallacy that regression modeling is the *only* generally accepted method for economic data analysis. There is no support for that argument, and it is contradicted by industry literature that provides that regression analysis is only one of several generally accepted methods for analyzing data. *See Scantin v. General Elec. Co.*, 510 Fed. Appx. 543, 544-45 (9th Cir. Feb. 21, 2013) (holding that the sufficiency of an expert's testing of an otherwise reliable opinion was "a proper subject for cross-examination," and not a basis to "preclude the expert from offering his opinion").

**5.      HP Mischaracterizes the Point of Dr. Snyder's Gross Margin Analyses**

HP makes a final attempt to discredit Dr. Snyder's gross margins opinions by citation to his purported "concession" that cartels can change their prices in response to marginal costs. (Mot. at 7 (citing Snyder Dep. (May 3, 2017) at 221:19-25).) HP argues that this statement undercuts the relevance of Dr. Snyder's opinion that price changes explained by cost changes are inconsistent with the alleged conspiracy. (Mot. at 7 ("[There is] no economically supported method to distinguish a gross margin pattern as consistent or inconsistent with a broad conspiracy.").)

HP does not cite *any authority* to support this bare conclusion. More importantly, this assertion ignores both the well-established value of data patterns to economic analysis, including cartel detection (*see supra* Sections II(C)(1), (3)), and the rest of Dr. Snyder's gross margins analysis. In addition to checking for periods where prices and costs may not have moved together during the alleged conspiracy period, Dr. Snyder studied whether the relationship between prices

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

22

and costs changed when the alleged conspiratorial activity began and ended.  (Lee Decl., Ex. 1 (Snyder Rpt. ¶ 158 (looking for a "divergence" between price and cost at the beginning and end of the alleged conspiracy period)), Ex. 10 (Posner, *supra*, at 88 ("[P]rice increases . . . unexplained by any increases in cost may . . . be good evidence of the initiation of a price-fixing scheme[.]")).)  HP does nothing to show that Dr. Snyder's multi-pronged margins analysis would not have reliably identified patterns consistent with collusion, had they existed in the data, and does not explain why Dr. Snyder's analysis would serve only to confuse or mislead the jury's determination of whether the data is consistent with HP's allegations.  Fed. R. Evid. 702(a); *see also Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013) (holding that the court's role is to "screen the jury from unreliable nonsense opinions," and allow "testimony [that] has substance such that it would be helpful to a jury").  HP's attempt to exclude Dr. Snyder's gross margins opinions fails.

## III.    CONCLUSION

For each of the foregoing reasons, HP's Motion to exclude certain portions of the expert testimony of Dr. Snyder and Dr. Murphy should be denied in its entirety.

Dated: August 21, 2017

Respectfully submitted,

By:    */s/ Belinda S Lee*

**LATHAM & WATKINS LLP**

Daniel M. Wall (Bar No. 102580)
Belinda S Lee (Bar No. 199635)
Brendan A. McShane (Bar No. 227501)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone:    (415) 391-0600
Facsimile:    (415) 395-8095
Dan.Wall@lw.com
Belinda.Lee@lw.com
Brendan.McShane@lw.com

*Counsel for Defendants Toshiba Corporation, Toshiba America Information Systems, Inc., Toshiba Samsung Storage Technology Corporation, and Toshiba Samsung Storage Technology Korea Corporation*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS
23

By: ___/s/ Ian Simmons___

**O'MELVENY & MYERS LLP**

Ian Simmons (*pro hac vice*)
Benjamin G. Bradshaw (Bar No. 189925)
1625 Eye Street, NW
Washington, DC 20006
Telephone:    (202) 383-5300
Facsimile:    (202) 383-5414
isimmons@omm.com
bbradshaw@omm.com

James Bo Pearl (Bar No. 198481)
Stephen J. McIntyre (Bar No. 274481)
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone:    (310) 553-6700
Facsimile:    (310) 246-6779
jpearl@omm.com
smcintyre@omm.com

*Counsel for Samsung Electronics Co., Ltd.*

By: ___/s/ Robert B. Pringle___

**WINSTON & STRAWN LLP**

Robert B. Pringle (Bar No. 51365)
Paul R. Griffin (Bar No. 83541)
Sean D. Meenan (Bar No. 260466)
Matthew R. DalSanto (Bar No. 282458)
Jeanifer E. Parsigian (Bar No. 289001)
101 California Street
Telephone:    (415) 591-1000
Facsimile:    (415) 591-1400
rpringle@winston.com
pgriffin@winston.com
smeenan@winston.com
mdalsanto@winston.com
jparsigian@winston.com

*Counsel for NEC Corporation*

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
24  OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

## **SIGNATURE ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I declare that concurrence has been obtained from each of the signatories to file this document with the Court.

By:   /s/ Belinda S Lee

Belinda S Lee

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' OPP. TO HP'S MOT. TO  PARTIALLY EXCLUDE
OPINIONS OF EDWARD SNYDER AND KEVIN MURPHY
Case Nos. 3:10-md-2143-RS, 3:13-cv-05370-RS

25